## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION


**John Chabria,** *et al.***,**

      **Plaintiffs,**

**-V-**                           **Case No. 2:06-CV- 00543**
                                        **JUDGE SMITH**
                                        **Magistrate Judge Abel**

**EDO Western Corporation,**

      **Defendant.**


### OPINION AND ORDER

Plaintiffs John Chabria ("Chabria"), Zenix, Inc. ("Zenix"), and Zenix Ltd. (collectively "Plaintiffs"), have brought this action seeking payment of approximately $1,164,000 in unpaid royalties.  On February 20, 2007, this Court granted in part and denied in part EDO Western Corporation's ("EDO") Motion to Dismiss Plaintiffs' Amended Complaint (Doc. 25).  EDO now moves for summary judgment dismissing all remaining claims (Doc. 47).  For the reasons that follow the Court **GRANTS** Defendant EDO's Motion for Summary Judgment.

# I.  FACTUAL BACKGROUND

This litigation was commenced by Plaintiffs in 2006 to recover $1,164,000 of unpaid royalties Plaintiffs claim they are owed under the Asset Purchase Agreement ("APA").  On February 20, 2007, this Court granted in part and denied in part Defendant EDO's Motion to Dismiss Plaintiffs' Amended Complaint, holding, *inter alia*, that Plaintiffs had sufficiently alleged EDO's failure to use its best efforts when performing under the APA, EDO's breach of the implied covenant of good faith and fair dealing and EDO's fraudulent inducement of Plaintiffs to enter into the APA (Doc. 25).  EDO has now moved for summary judgment, contending that Plaintiffs' claim for breach of an implied contractual obligation to reasonable efforts must fail because no such obligation should be implied in this case, and even if such an obligation is implied, EDO fulfilled the obligation by making extensive efforts to sell the Zenix line and by acting in good faith at all times in operation of the business.  EDO further contends that it is entitled to summary judgment on Plaintiffs' fraudulent inducement claim for the following reasons: (1) it is barred by the statute of limitations; (2) the alleged misrepresentations all relate to the performance of the APA and cannot give rise to a separate cause of action for fraud; (3) Plaintiffs' reliance on the alleged misrepresentations were not reasonable; and (4) the alleged misrepresentations were all statements of future intent, which Plaintiffs cannot establish were false when made.

## A.      Plaintiff Chabria's Background in the Microwave Ceramics Industry

In or around 1964, Plaintiff Chabria started Xtalonix, a microwave ceramics business, in Columbus, Ohio.  He sold the business to Harshaw Chemical in 1966, but stayed on as manager.  The business changed hands a number of times, and Chabria eventually repurchased it in the early 1980s. In April 1996, Xtalonix attempted to expand and moved its

operations to Maryland, transferring most of the equipment previously located in Columbus. The attempted expansion failed because Xtalonix "racked up debt by spending money faster than it could bring it in . . . ." (Chabria Depo. at 200:3-19). To avoid bankruptcy, Xtalonix was forced to enter into receivership. Trak Ceramics purchased the assets of Xtalonix's business in 1997 for $1,760,000.

## B.    Zenix's Background

In early 1998, former Xtalonix employee Eugene Belousof, along with Plaintiff Chabria and former Xtalonix engineer Jyoti Chakravarty, decided to start another microwave ceramics business with the equipment that had been left behind when Xtalonix moved its operations to Maryland in 1996. Belousof incorporated Zenix on February17, 1998. In addition to Belousof, Chabria and Chakravarty, Zenix had 2-3 employees who worked in production. The Zenix equipment had not been used for approximately 2 years. Zenix subsequently purchased or leased kilns, grinding mills, a mixer, an isostatic press and some "small other things." (*Id.* at 51:17-52:14). Zenix also leased $130,000-$150,000 worth of equipment. One of Zenix's customers, Northrop Grumman, loaned the company some equipment.

Belousof resigned his position as President of Zenix on April 1, 1998. He told Chabria that there was no money to be made in Columbus with Zenix, and he wanted to explore opportunities in Cincinnati. During his time at EDO, Belousof received no salary, bonus, commission or other form of compensation. According to Belousof, Plaintiff Chabria paid him $5,000 for Zenix and took over the company in April of 1998. (Belousof Depo. at 124:22-125:16). Chabria testified that at the time he took over Zenix, the company "was worth nothing to anybody . . . ." (Chabria Depo. at 239:18-20). When Zenix needed money, Plaintiff Chabria and his wife provided capital from their personal finances. In the short time Zenix was in

operation, Chabria made several infusions of capital, including $19,500 in April, $25,000 in May, $25,500 in June and four other deposits in July and September totaling $25,400. Plaintiff Chabria, like Belousof, did not take a salary from Zenix.

Based upon the records provided to EDO during due diligence, as of October 15, 1998, Zenix had 42 customers, 35 of whom had purchased less than $5,000 worth of product. Zenix spent no money on advertising and did not attend trade shows. Instead, its marketing efforts consisted of calling customers. Through October 15, 1998, Zenix made between $181,296.79 and $205,684.19 in sales.

**C.      EDO's Acquisition of Zenix in 1998**

Defendant EDO is a defense contractor with its headquarters in New York City and its manufacturing facilities in Salt Lake City, Utah. In late 1997, EDO began looking for growth opportunities outside of its core business, piezo-ceramics. EDO identified microwave ceramics as an industry with significant growth potential. EDO identified Zenix as a potential acquisition candidate, and approached Plaintiff Chabria in April or May 1998.

During the Summer 1998, EDO's Frost began negotiations with Chabria to acquire Zenix. Chabria's asking price was $2,000,000, based upon what he claimed was great growth potential for Zenix's start-up product line. EDO's Frost expressed to Chabria that he did not feel Zenix was worth $2,000,000 given that it was a newly formed business with limited production capacity and limited sales revenues and there was no evidence that Zenix had the ability to generate sufficiently large revenues to justify such a purchase price. (Frost Decl., ¶ 5-6).

During the following months, EDO representatives visited Columbus to conduct due diligence. Because the acquisition had to be approved by EDO's corporate management, the staff in Salt Lake City prepared a memorandum addressed to Bill Frost, EDO Corporation's Vice

4

President-Administration and Secretary, and Ira Kaplan, EDO Corporation's President, outlining

EDO's plan to acquire Zenix and develop a microwave line. The memorandum, dated July 21,

1998, was provided to Chabria so he could confirm for EDO both that the projections were

justified and that they had correctly identified the equipment needed to start up production of the

line in Salt Lake City. The Memorandum stated that:

> The purchase price of Zenix is estimated at $2,000,000, with an
> initial investment of $800,000. The balance will be paid at 5% of
> sales during subsequent years. In order to achieve the projected
> sales levels, an additional investment of $4,785,000 in equipment
> and facilities will be required over the next six years. Equipment
> investment by year are:
>
> | | |
> |---|---|
> | Year 1 | $  600,000 |
> | Year 2 | $1,200,000 |
> | Year 3 | $1,400,000 |
> | Year 4 | $  140,000 |
> | Year 5 | $1,280,000 |
> | Year 6 | $  125,000 |

(Chabria Aff. ¶ 11, Ex. 1-A). Using market research as well as input from Chabria, EDO

projected that sales of the microwave ceramic line at EDO would be $521,000 in 1998,

increasing to $13,000,000 by 2003. EDO projected that it would spend an additional $4,785,000

on equipment and facilities over the next six years. These expenditures were tied to the sales

projections. The plan was eventually presented to EDO Corporation's senior management and

approved.

In 1998, EDO had not previously manufactured microwave products, did not have its

facility in Salt Lake City equipped to manufacture microwave products, and EDO's employees

had not previously manufactured or sold microwave products. Consequently, EDO agreed to

hire Chabria as its Sales manager for 3½ years at a salary of $75,000 per year, and to hire Jyoti

Chakravarty in an engineering position at a salary of $59,592 per year. During pre-purchase

negotiations with EDO, Chabria stressed his experience, representing that he "had much involvement in the industry and formed various companies and had sold more than one to other investors and even purchased either the assets or a company back from one to who[m] he had sold it." (Frost Depo. at 21:9-20).

After much negotiation, EDO and Chabria became parties to the APA, which was executed on December 9, 1998. The APA called for EDO to purchase "substantially all of the assets" of Zenix, Inc. (*See* Am. Compl., Ex A). The APA states that the purchase price for the assets shall be $669,107.85. (Am. Compl., Ex A at 2.1). EDO paid this amount to Plaintiffs plus $130,892.15 to Zenix's equipment suppliers to pay off existing equipment leases. The parties agreed that EDO would pay Plaintiffs royalties on sales of the Zenix Product Line. The royalties provision, Section 2.4(a), provides in relevant part:

> In addition to the Purchase Price, Buyer shall pay Seller a royalty ("Royalty") in the amount of five percent (5%) of the Gross Sales From the Zenix Product Line ([defined in § 2.4(b) of the agreement]) sold by Buyer from and after Closing; provided, the obligation to pay the Royalty shall terminate at such time as the aggregate amount of Royalty paid to Seller equals $1,200,000. The Royalty shall be paid to Seller quarter-annually within 25 days after the calendar quarter in which it is earned.

(Am. Compl., Ex A at Section 2.4(a)).

Plaintiffs allege that during the negotiation process, EDO representatives represented that based on its market research, EDO could guarantee that it would keep the Zenix product line in the marketplace to generate enough revenue to pay enough royalties to amount to the $2,000,000 Plaintiffs originally requested. (*See* Am. Compl. ¶ 15). Plaintiffs allege that EDO representatives further indicated that they intended to keep the Zenix product line in operation in order to generate the $2 million, and even that EDO would spend $6,700,000 after purchasing Zenix in order to promote, sell and produce Zenix products. (Am. Compl. ¶ 16-17).

The APA also contained a standard merger clause. The merger clause provides as follows: "This Agreement (including the Exhibits and Schedules hereto) sets forth the entire understanding of the parties and supersedes any and all prior agreements, arrangements and understandings relating to the sale of Assets by Seller and Buyer." (Am. Compl., Ex A at Section 8.9). Finally, under the APA, Seller was required not to compete with Defendant EDO for six years after the closing of the sale. (Am. Compl., Ex A at 6.4).

**D.      The Move of the Microwave Ceramic Line to Salt Lake City**

Prior to the closing of the APA, the Zenix plant was located in Columbus, Ohio. After the APA closed, EDO implemented its plan to move production of the Zenix product line from Columbus to Salt Lake City. The move was planned in three phases: Phase I - Qualification; Phase II - Initial Production Start Up; and Phase III - 2000 Full Production Operation. Per the plan, in the first half of 1999, EDO continued production in Columbus while it built its facility in Salt Lake City, purchased the equipment necessary to equip the Salt Lake City facility, and manufactured some product for qualification by Zenix's customers. EDO consulted Zenix's Chakravarty regarding the layout of the Salt Lake City facility and the equipment to be purchased.

Production operations were moved from Columbus to Salt Lake City beginning on June 29, 1999. Plaintiff Chabria objected because the Salt Lake City facility was not ready or equipped for manufacturing at the time the Columbus plant was closed and manufacturing was disrupted. Plaintiffs allege that this disruption resulted in EDO being "unable to timely respond to Requests for Quotations ("RFQs") that Mr. Chabria had obtained from existing or potential customers." (Pls.' Memo. in Opp. at 7). By August 1999, EDO had purchased all of the equipment outlined in Phases I and II of its plan, such that the facility was ready to commence

7

production and handle the initial sales projected.  The total cost to EDO up to this point was $1,380,210.98.  In addition, after production operations were transferred to Utah, EDO moved John Chabria's and Jyoti Chakravarty's personal belongings to Salt Lake City at a cost of $34,000.

**E.      EDO's Efforts to Produce the Zenix Product Line**

After the move to Salt Lake City, EDO encountered technical issues with Zenix's intellectual property.  Product formulations and process were incomplete and/or flawed.  Further, much of the product that EDO was able to produce using the Zenix formulas did not meet required specifications.  The Zenix line's profitability was negatively impacted by these issues.

In an effort to resolve these issues, EDO utilized a portion of its research and development budget to adjust the written formulas provided by Zenix.  In addition to the work of EDO's own employees, EDO also hired, at additional cost, two outside consultants.  In total, EDO spent $102,355 on research and development to correct the flawed Zenix formulas and developing formulas for products that had been listed in Zenix's catalog, but never actually produced by Zenix.

In order to implement Phase II of it's plan—the Initial Production Start Up Phase—EDO indicates it took the following steps:

- Spent $250,996 on bids and proposals in order to produce samples and generate quotations for particular products;

- Spent $17,000 to publish a catalog for the microwave ceramic line;

- Spent significant sums on advertising and travel, including a 1999 budget of $20,000 for wireless media advertising and $60,000 for travel;

- Hired 9 different companies to act as sales representatives both in the United States and abroad;

- Transferred 7 people to the microwave line and hired 9 new people, all of whom, along with Jyoti Chakravarty, were dedicated to production of microwave ceramic products (in contrast to Zenix's 3-4 production employees) at an average annual salary of $30,150; and

- Hired Chabria's friend, Eugene Belousof, to be its Sales Marketing Specialist, and later promoted him to General Manager; Belousof's annual salary was $79,612, and EDO paid $10,000.00 to move him to Utah.

(Def.'s Mot. for Summ. J. at 10, citations and footnotes omitted).

**F.     EDO's Decision to Stop Production of the Zenix Product Line**

In 2000, EDO was scheduled to implement the final phase of it's production plan. Completion of Phase III would allow EDO to achieve significant capacity production. Phase III called for EDO to purchase expensive equipment. EDO states that the equipment EDO planned to purchase for Phase III would have been necessary to meet the volume of sales that had initially been projected to materialize by 2000. (*Id*. at 11). The Zenix line, however, did not generate the pre-acquisition predicted volume of sales. Consequently, EDO determined that the projected Phase III expenditures were not warranted.

EDO states the unforeseen downturn in the telecommunications market starting in late 2000 and escalating in 2001 and 2002 further hindered its ability to sell the Zenix line. (*Id*.). EDO sustained net losses in each year of operation, totaling $711,000 over the life of the line.

In response to these continued losses, EDO began discussing the possibility of shutting down the line in late 2001 during the operational planning process for 2002. These conversations continued until 2003 and involved many individuals, including Gary Springfield, EDO's General Manager, Carl Stuart, EDO's Controller, Milo Hyde, the Group Vice President

for EDO Corporation's Systems and Analysis Group, Dan Wood, EDO Corporation's Group Director of Finance, Darrell Reed, EDO Corporation's CFO, and Fred Bassett, Reed's replacement. Wood and Hyde wanted to implement a plan to stem EDO's continued losses. Consequently, in February 2002, Springfield drafted a memorandum which laid out several options, including selling the business, shutting down the business, or implementing a "power down strategy" – that is, paring down operations and reducing expenses as much as possible.

In his February 2002 memorandum, Springfield raised the issue of Plaintiff Chabria's royalty clause in the APA and questioned whether it could have any impact on the liabilities of the microwave ceramic business: "[T]here could be another $1,164k in royalty commission due to John [Chabria] depending on your view of the purchase agreement." (Springfield Decl. ¶ 39, Ex. 7). Subsequently, on April 17, 2002, Wood informed Springfield that he had consulted the APA and determined that EDO only owed royalties to Chabria on actual sales made. Therefore, once sales ceased, the royalty obligation would terminate. (*Id.*, ¶ 40, 42).

In or around late February 2002, Wood and Hyde decided that Springfield should initiate a "power down strategy" for the microwave line. After this decision was made, Springfield was told that his division could remain in the market if it could make the line a success. EDO was unable to generate enough sales to break even.

In May 2002, EDO decided to put the Zenix line in "cold storage." "Cold storage" involved shutting down production in such a way that it could be resurrected without too much effort if the telecommunications market picked back up. Under the "cold storage" plan, EDO completed all existing customer orders and then stored the microwave ceramic equipment in a warehouse.

In June 2002, Plaintiff Chabria's employment contract with EDO expired. Subsequently, unbeknownst to EDO, its employee Eugene Belousof (hired at Chabria's recommendation) began forwarding to Chabria's personal e-mail account confidential EDO business communications. Consequently, Chabria received notice of EDO's intention to stop selling microwave ceramic products and its plan to either put the assets in storage or sell off the business.

In July 2002, EDO informed its customers and employees that the microwave line would not be available after September 1, 2002. The last outstanding customer orders were filled by shipments made in September, 2002. By the end of November 2002, the equipment was moved to a warehouse, staff was reassigned or terminated, and the space in the Salt Lake City manufacturing facility was dedicated to another product line. Meanwhile, Springfield asked Belousof to solicit bids for purchase of the microwave ceramic business. EDO received three offers to purchase the microwave ceramic business, including one from Belousof himself, but EDO's senior management decided that the offers were too low and decided not to sell the assets at such a discounted price.

In 2002 and 2003, EDO was forced to write down some of the assets of the microwave line. EDO wrote off $190,324.27 of goodwill and intangibles associated with the Zenix microwave line in June 2002, and $734,000 of receivables and inventory associated with the microwave line in June 2003. As a shareholder of EDO, Chabria received the annual reports disclosing the write-offs associated with the microwave ceramic line.

**G.      Litigation Following the Closure of the Zenix Product Line**

On March 10, 2003, attorney Bruno Voltolini sent a letter to EDO on behalf of Zenix, Ltd. and Jane Chabria regarding the APA.  Voltolini noted that his clients were aware that EDO had exited the microwave ceramics business and requested payment of approximately $1,150,000 in royalties allegedly owed under the APA.  EDO responded that it did not owe Chabria any additional royalties: on May 3, 2003, EDO's in-house counsel sent Voltolini a letter stating that under the APA, EDO did not owe royalties to Chabria in those quarters in which no product was produced, that EDO was not obligated to inform Chabria of the cessation of production, and that EDO had no obligation to pay Chabria upon that event.  Some time before the end of May, Voltolini called EDO's in-house counsel regarding the May 3, 2003 letter.  Counsel reiterated EDO's position that under the APA, EDO owed no further royalties to Chabria.

On June 5, 2006, Chabria commenced this action by filing a complaint in the Franklin County Court of Common Pleas, Ohio, entitled *John Chabria et al., v. EDO Western Corporation*, which was assigned Case No. 06CVH-06-7298.  Pursuant to 28 U.S.C.A. § 1441(a), EDO filed a timely Notice of Removal to remove the action to this Court.


## II.  SUMMARY JUDGMENT STANDARD

The standard governing summary judgment is set forth in Fed. R. Civ. P. 56(c), which provides:

> The judgment sought shall be rendered forthwith if the pleadings, Depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate, however, if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

When reviewing a summary judgment motion, the Court must draw all reasonable inferences in favor of the nonmoving party, and must refrain from making credibility determinations or weighing the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000).[1] The Court disregards all evidence favorable to the moving party that the jury would not be required to believe. *Id.* Stated otherwise, the Court must credit evidence favoring the nonmoving party as well as evidence favorable to the moving party that is uncontroverted or unimpeached, if it comes from disinterested witnesses. *Id.*

Additionally, in responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed

_____

[1] *Reeves* involved a motion for judgment as a matter of law made during the course of a trial under Fed. R. Civ. P. 50 rather than a pretrial summary judgment under Fed. R. Civ. P. 56. Nonetheless, standards applied to both kinds of motions are substantially the same. One notable difference, however, is that in ruling on a motion for judgment as a matter of law, the Court, having already heard the evidence admitted in the trial, views the entire record, *Reeves*, 530 U.S. at 150. In contrast, in ruling on a summary judgment motion, the Court will not have heard all of the evidence, and accordingly the non-moving party has the duty to point out those portions of the paper record upon which it relies in asserting a genuine issue of material fact, and the court need not comb the paper record for the benefit of the nonmoving party. *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001). As such, *Reeves* did not announce a new standard of review for summary judgment motions.

fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Id., quoting Liberty Lobby*, 477 U.S. at 257. The nonmoving party must adduce more than a scintilla of evidence to overcome the summary judgment motion. *Id.* It is not sufficient for the nonmoving party to merely "'show that there is some metaphysical doubt as to the material facts.'" *Id., quoting Matsushita*, 475 U.S. at 586.

Moreover, "[t]he trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Id.* at 1479-80. That is, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001).

## III. DISCUSSION

As an initial matter, the parties agree that New York law governs. (Am. Compl., Ex A at 8.9; Def.'s Mot. to Dis. at 4; Pls' Memo. in Opp. to Mot. to Dis. at 1). EDO has moved for summary judgment on Plaintiffs' two remaining claims, the breach of contract claim and the fraudulent inducement claim (Doc. 47). The Court will address EDO's arguments with respect to these claims in turn.

### A.  Breach of Contract Claims (Counts One and Two)

In the Amended Complaint, Counts One and Two, Plaintiffs allege that Defendant EDO breached its contractual duties by failing to make reasonable efforts to sell the Zenix Product Line. Defendant EDO advances two arguments in support of its Motion for Summary Judgment with respect to these claims. First, EDO argues that summary judgment is warranted because no obligation to use reasonable efforts should be implied in the present case. (Defs.' Mot. for Summ. J. at 19-21, Reply at 1-2). Second, EDO asserts that in any event, EDO has demonstrated

that it did, in fact, use reasonable efforts to generate sales and resulting royalties. (*Id*. at 21-30, Reply at 3-8).

In support of their first argument, EDO maintains that Plaintiffs were adequately compensated with an upfront payment, and thus, the equitable purposes served by inferring a reasonable efforts clause are not implicated in this case. (Defs.' Mot. for Summ. J. at 21). EDO points out that it paid nearly $800,000 up front for Zenix assets—assets which Plaintiff Chabria had purchased just eight months earlier for $5,000, and which had historically generated less than $200,000 in sales in the eight months of operation. (*Id*. at 17). In addition, EDO guaranteed Plaintiff Chabria employment for 3.5 years at a salary of $75,000 per year, whereas Chabria had taken no salary at Zenix.

The Court disagrees with EDO's conclusion. New York courts have held that a promise to pay royalties resulting from an exclusive agency necessarily implies a promise to use best or reasonable efforts to bring such revenues and royalties into existence. *See, e.g., Morris v. Putnam Berkley, Inc*., 687 N.Y.S.2d 139, 140 (N.Y.A.D. 1 Dept., 1999) ("Since the contract called for plaintiff to be compensated, in large measure, by royalties . . ., the court properly found an implied promise on defendant's part to use its best efforts . . . and, accordingly, that defendant's decision not to market or distribute . . . could constitute a breach of an implied covenant of good faith and fair dealing."). *See also Wood v. Lucy, Lady Duff-Gordon*, 222 N.Y. 88 (1917) (where parties entered into agreement for the exclusive right to sell or license designs in return for royalties, it is proper to imply a promise to use all reasonable efforts to market such designs); *Mellencamp v. Riva Music, Ltd.,* 698 F.Supp. 1154, 1157 (S.D.N.Y. 1988), ("[w]hen the essence of a contract is the assignment or grant of an exclusive license in exchange for a

share of the assignee's profits in exploiting the license, these principles imply an obligation on the part of the assignee to make reasonable efforts to exploit the license").

In the case at bar, the APA gave Defendant EDO an exclusive right to license, manufacture and distribute the Zenix product line. In return, Plaintiffs, like the *Morris* plaintiff, were to be compensated with cash and also in large measure, by royalties. The APA's royalty provision exists for the exclusive benefit of Plaintiffs and does not call for a minimum royalty payment. In addition, pursuant to the APA's six-year non-compete provision, Plaintiffs were prohibited from engaging in any business activity that was substantially the same as, or competitive with, Defendant EDO's business or involved in any way with Zenix's assets. (Am. Compl., Ex. A at Section 6.4). Based upon these circumstances, the Court finds that Defendant EDO did indeed have a duty to use reasonable efforts to sell the Zenix product line.[2]

EDO cites to three cases, which it contends support its contention that implication if a best efforts clause is inappropriate in the case at bar: *Permanence Corp. v. Kennametal, Inc*., 908 F.2d 98, 101 (6th Cir. 1990), *Beraha v. Baxter Health Care Corp*., 956 F.2d 1436, 1442 (7th Cir. 1992), and *Kardios Systems Corp. v. Perkin-Elmer Corp*., 645 F. Supp. 506 (D. Md. 1986). Two of the cases, *Permanence* and *Beraha*, were not applying New York law. *See Beraha*, 956 F.2d 1436 (applying Illinois law); *Permanence*, 908 F.2d 98 (applying Pennsylvania law). In *Permanence* and *Beraha*, the courts found that it was not required to recognize an implied duty to use reasonable efforts where it deemed it unnecessary to protect the plaintiff from being

---

[2]Further, if Defendant EDO's suggested construction of its duty of good faith and fair dealing were adopted, Defendant EDO could have shut down the Zenix product line immediately after signing the APA, rendering the APA's royalty provisions illusory in violation of the established rule of contract construction that a contract should be construed to give effect to all of the contract's provisions. *See e.g.*, *God's Battalion of Prayer Pentecostal Church, Inc. v. Miele Assocs., LLP*, 6 N.Y.3d 371, 374 (2006).

placed at the mercy of the defendant. Unlike the instant case, however, in both *Permanence* and *Beraha*, the consideration paid up front expressly included "advance" or "minimum" royalties. The APA provides no such protection. (*See* February 2, 2007 Opinion and Order at 11-13, holding that the terms of the APA are unambiguous and do not amount to a mandatory requirement that EDO pay $1.2 million in royalties). The third case relied upon by Defendant EDO, *Kardios*, is also distinguishable. In *Kardios*, the at-issue contract expressly provided a remedy if the defendant failed to market the product. In addition, the contract did not confer exclusive marketing rights.[3] 645 F.Supp. at 509. In the instant case, the APA gave EDO an exclusive license, Plaintiff Chabria was barred by a six-year noncompete clause, and the APA contained no minimum royalties or liquidated damages provisions.

EDO next argues that it is entitled to summary judgment on this claim because it has demonstrated that it used reasonable efforts to generate sales and royalties for the Zenix product line, and Plaintiffs have wholly failed to raise any triable issue of fact in response. (Def.'s Mot. for Summ. J. at 21-30; Reply at 3-8). Plaintiffs respond to this argument by asserting that "[w]hether a defendant has performed its implied covenant to use reasonable efforts is an issue of fact to be resolved by a jury." (Pls.' Memo. in Opp. at 14 (*citing Unistel Textile Machine Corp. v. Struthers Wells Corp.*, 268 N.Y.S.2d 973 (N.Y. App. Div.1966)).

Contrary to Plaintiff's assertion, whether a party has used "best efforts" or "reasonable efforts" is an issue that may appropriately be determined on summary judgment. *See Scott-Macon Securities, Inc. v. Zoltek Companies*, 2007 WL 2914873, at *1 (2d Cir. 2007) (rejecting

---

[3]Further, to the extent that *Kardios* was applying New York law, it was decided before *Morris*, which demonstrates that New York courts do no limit the implied duty to use reasonable efforts to cases in which it is necessary to save a contract otherwise lacking in mutuality. *See Morris*, 687 N.Y.S.2d at 140.

argument that whether efforts were reasonable is never appropriate for summary judgment) (summary order); *Hasbro, Inc. v. Child's Play Intern. Corp.*, 1991 WL 156282, at *6 (S.D.N.Y. 1991), *aff'd*, 962 F.2d 2 (2d Cir. 1992). The case cited by Plaintiffs, *Unistel Textile Machine Corp.,* does not dictate a contrary result. There, the court simply stated that, based on the record in *that* case, whether the defendant had used reasonable efforts was a question for the jury. Therefore, the Court now considers whether material triable issues of fact remain as to whether Defendant EDO used reasonable efforts to generate sales and royalties for the Zenix product line.

The Court finds that Defendant EDO has presented significant evidence that demonstrates that it did indeed use reasonable efforts under the circumstances. In its Motion for Summary Judgment, EDO points out that such efforts included:

- EDO built out a dedicated area in its existing Salt Lake City facility at a cost of $408,669.75 (Ex. 7, Springfield Dec., ¶22);

- EDO invested in new equipment at a cost of more than $971,541.23 (id., ¶18);

- EDO hired key Zenix employees Chabria and Chakravarty in December, 1998, and paid to move them from Columbus, at an approximate cost of $471,072 for salaries (over 3 1/2 years) and $34,000 for moving expenses;

- EDO hired Eugene Belousof at Chabria's urging in October, 1999, and paid to move him from Cincinnati, at an approximate cost of $199,030 over 2 1/2 years for salary and $10,000 for moving expenses; EDO later reorganized the business and promoted Belousof to manage it (Ex. 10, Jaussi Dec., ¶8);

- EDO hired 6 new dedicated production employees in Salt Lake City (in addition to Chabria, Belousof and Chakravarty) and transferred 7 dedicated production employees from other areas of operation; these 13 production employees, plus Chakravarty, all worked on production of the Zenix products at an average annual salary of $30,150;

18

- EDO spent significant time and resources ($102,355) on research and development to reformulate defective Zenix formulas and develop formulas for products that had been listed in Zenix's catalog but never actually produced by Zenix;

- EDO spent significant time and resources ($250,996) on bids and proposals in order to produce samples and generate quotations for particular products;

- EDO invested in sales and marketing to promote the line – $17,000 to publish a catalog for the microwave ceramic line – plus a 1999 budget of $20,000 for wireless media advertising and $60,000 for travel;

- EDO hired 9 different companies to act as sales representatives both in the United States and abroad; and EDO hired two outside technical consultants.

(Def.s' Mot. for Summ. J. at 22-23).

Plaintiffs dispute EDO's assertion that reasonable efforts were used. Instead, Plaintiffs maintain that EDO's failure to use reasonable efforts are documented by record evidence, and therefore, summary judgment on this claim is inappropriate because there exists genuine issues of material fact as to whether Defendant EDO's efforts were reasonable. (Pls.' Memo. in Opp. at 16). Specifically, Plaintiffs' arguments that EDO failed to use reasonable efforts fall into two categories: (1) a failure to invest the full $4,785,000 in equipment and facilities that EDO had earlier predicted would be necessary to achieve projected sales (*Id*. at 16-17); and (2) omissions, bad faith acts and general mismanagement of the business (*Id*. at 17-19).

On the first issue, EDO has presented substantial evidence regarding the money it spent on equipment and facilities to manufacture the Zenix product line in Salt Lake City. EDO invested in equipment and facilities according to the first two phases of the pre-acquisition projections on which Plaintiff Chabria claims to have relied. In addition, as other equipment was identified as necessary, EDO purchased it. Specifically, Springfield testified that EDO made

unplanned purchases of a vibration sampling magnetometer, a spherical grinding machine, a spectrum analyzer, and fixtures for the equipment. (Springfield Depo. at Vol. 1., 134:16-21; 134:22-135:10, 225:17-19, 21-23, 244:19-245:12; Vol. 2, 22:5-13). In 2000, the year EDO had expected to implement Phase III of its plan to purchase equipment for the Zenix line, EDO's booked sales lagged far behind its initial projections. Without sales at a certain level, EDO had no need for the Phase III production equipment. EDO indicates it could not justify spending money on equipment it did not yet need. Therefore, EDO did not purchase the equipment.

The facts of *Hasbro v. Child's Play*, *supra*, are analogous in that the defendant in *Hasbro* also failed to take all of the steps it had originally anticipated when it entered into the agreement at issue. Hasbro obtained an exclusive license to manufacture and sell Child's Play's line of ninja action figures. During negotiations, Hasbro represented that it anticipated spending $2-5 million on television advertising. 1991 WL 156282 at *2. Notwithstanding Hasbro's significant efforts, it was unable to sell the action figures at levels it had anticipated and ultimately determined that the number of action figures ordered by its customers did not warrant television advertising. Hasbro therefore abandoned its plan to launch a television advertising campaign. *Id*. at *3-4. Child's Play sued and Hasbro moved for summary judgment. The *Hasbro* court, in its opinion granting summary judgment, took note of Hasbro's description of its efforts to exploit the line, and observed that Child's Play had failed to come forward in response with any evidence that such efforts were insufficient. *Id*. at *5. The *Hasbro* court also noted that if a best efforts duty were to be implied, "it, of course, would not have required Hasbro slavishly to devote its efforts to marketing the Line." *Id.* at *6.

In the instant case, Defendant EDO purchased and operated the Zenix product line for 3.5 years, investing in excess of $3 million after purchasing. The evidence shows that the Zenix

product line continued to lose money and sales were not as expected.  As the *Hasbro* court noted, implication of a best efforts duty does not require slavish devotion to the marketing of the line, especially in light of the continued and unanticipated monetary losses and low sales. Reasonable efforts does not require every possible effort, to the detriment of one's own interests or finances. *See e.g.*, *Scott-Macon Securities, Inc. v. Zoltek Companies*, 2005 WL 1138476, *14 (S.D.N.Y. 2005) (under a reasonable efforts clause "a party is entitled to give 'reasonable consideration to its own interests' in determining an appropriate course of action to reach the desired result"), *aff'd in relevant part, vacated in part, and reversed in part*, 2007 WL 2914873 (2d Cir. 2007). *See also Johns v. Rexam Medical Packaging*, 2005 WL 1308319, at *10 (M.D. Ga. 2005) ("[T]he implied covenant of good faith does not require a party to a contract to exert the maximum possible effort.  Indeed, a party can in good faith exert no effort at all, if it can show that a business decision to exert no effort was reasonable under the circumstances."). Accordingly, this Court, like the *Hasbro* court, holds that Defendant EDO's failure to implement Phase III of its pre-acquisition plan does not constitute evidence creating a material question of fact with respect to the issue of whether Defendant EDO took reasonable efforts to market the Zenix product line.

Likewise, the Court finds that Plaintiffs' allegations regarding Defendant EDO's omissions, bad faith acts, and general mismanagement of the business have failed to raise material facts precluding summary judgment.  Several of the allegations lack evidentiary support. Other allegations simply describe instances in which Plaintiffs subjectively believe EDO could have better managed the business.

For example, Plaintiffs complain that EDO moved the business from Columbus, Ohio to Salt Lake City in June 1999 "[o]ver Chabria's strenuous objection." (Am. Compl. ¶ 30).  The

evidence shows, however, that the move to Salt Lake City was always contemplated by the parties. (*See* Chabria's Employment Agreement with EDO, Am. Compl., Exhibit C, which expressly required Plaintiff Chabria to relocate to Utah). Plaintiffs also allege that Defendant "disposed of an estimated $500,000 of finished inventory." (Am. Compl. ¶ 30). Yet, Schedule 2.2 of the APA establishes that EDO purchased only $50,000 of inventory in the first place. Moreover, it is undisputed that much of this inventory was actually old Xtalonix inventory left behind when the business was moved to Maryland in 1996. EDO asserts that approximately 75-85% of the inventory in Columbus did not have testing records or lot traceability records. EDO indicates it disposed of the product because it could not sell the product without that information. In addition to the inventory, Plaintiffs allege that EDO "disposed of an estimated $200,000 worth of custom-made tooling, fixtures, dyes, and molds." (Am. Compl., ¶32). The record reveals, however, that all of the "dyes, tools, fixtures, jigs, patterns and shop aids" EDO purchased under the APA were valued at a total of only $10,000. (*See* APA Schedule 1.2(a)-3). Further, of the $211,000 worth of equipment EDO purchased from Zenix per APA Schedule 1.2(a), EDO moved to Utah almost all of the equipment that was required for production and that EDO had not already decided to replace. EDO left behind equipment that could not be moved, significantly older equipment, office furniture, and a computer for which it had no use.

Plaintiffs also complain that EDO did not have its Salt Lake City facility ready or equipped for manufacturing by the time it closed the Columbus plant, which caused manufacturing interruptions. (Am. Compl.at ¶ 31). EDO admits that the Salt Lake City facility was not ready in April 2009 as planned, but explains that it was not because it failed to use reasonable efforts. Instead, it was an unforseen consequence of needing to have the power company install a new transformer to bring a main line into the building, causing a four month

delay. (Springfield Decl. ¶ 22). Plaintiffs have failed to bring forth any evidence demonstrating that the delay was intentional.

In addition, Plaintff Chabria complains that EDO changed Zenix's production formulas in bad faith. (Am. Compl. ¶ 58). Again, the evidence does not support a conclusion of bad faith. First, Zenix's Jyoti Chakravarty acknowledged that the Zenix formulas would have to be adjusted to account for the new production equipment in Salt Lake City, the differences in materials coming from new suppliers, and the drier climate of Utah. (Ex. 15, Chakravarty Dep. at 96:6-98:24). Second, EDO discovered that the Zenix product formulations and processes, as documented by Zenix and provided to EDO after the sale, were incomplete and/or flawed. Much of the product that EDO was able to produce using the Zenix formulas did not meet the specifications required by its customers. Despite these problems, EDO dedicated itself to adjusting the written formulas provided by Zenix, and spent considerable time and resources doing so.

Plaintiffs also complain that EDO failed to consider Plaintiff Chabria's advice on marketing Zenix's products. (Am. Compl. ¶ 58). Again, the evidence fails to support this allegation. EDO hired Chabria as its sales manager. EDO allowed Chabria to select the customers he marketed to, travel to visit the customers he wished, and attend trade shows both in the US and in Europe. (Springfield Decl. ¶ 28). EDO published a catalog per Chabria's instructions. EDO hired sales representatives at Chabria's request. (*Id.* at ¶ 31). EDO hired Eugene Belousof at Chabria's request.

Plaintiffs, in the "Factual Background" Section of their Memorandum in Opposition, assert that the June 25, 2002 email from Eugene Belousof to Gary Sprinfield, "confirms the existence of a genuine issue of material fact as to EDO's intentions with respect to its decision to

utilize a cold storage strategy." (*Id*. at 11). Plaintiffs contend that EDO acted in bad faith by putting the production line in "cold storage" with the purpose of avoiding an alleged duty to pay Plaintiff Chabria royalties under the APA. Plaintiffs' arguments with respect to this claim fail because they rest on the faulty premise that the terms of the APA required EDO to pay $1.2 million in royalties. In this Court's February 20, 2007 Order, the Court ruled that the APA did not contain a mandatory requirement that EDO pay Plaintiffs $1.2 million in royalties, but instead, that the "$1.2 million figure served a ceiling on the amount of royalties Defendant EDO could pay to Plaintiffs rather than a floor as [was] Plaintiffs' contention." (Doc. 25 at 11-13).

Plaintiffs also point to several instances in which they believe EDO mismanaged the business. For example, Plaintiffs complain that EDO did not send employees to be trained in the Zenix plant in Columbus, Ohio. (Pls.' Memo. in Opp. at 17). Plaintiffs fail to show, however, how training personnel in Columbus, a plant being shut down, was preferable to training them in Salt Lake City, where they would be actually working, or how this omission was detrimental to the success of the Zenix product line.

Plaintiffs further allege, in conclusory fashion, that EDO failed to "provide samples," to "timely complete orders," to "respond to RFQs," and to "be responsive." (*Id*. at 7-8). Plaintiffs, however, provide no specifics regarding any of these alleged failures, and again, their conclusory allegation is contradicted by the undisputed evidence in the record. EDO has already established that it spent $250,996 to produce samples and generate quotations for particular products. Plaintiffs do not refute that evidence. Similarly, Plaintiffs make the bald assertion that EDO's alleged failure to convert RFQs into sales resulted in part from its "failure to fund research and development." (*Id*. at 8). Yet, nothing more is said on that alleged failure in the entire brief, and

EDO has already proffered evidence that it actually spent at least $102,355 on research and development. (Defs.' Mot. for Summ. J. at 10).

In conclusion, the Court finds that Defendant EDO has presented evidence that they used reasonable efforts to market the Zenix Product. Plaintiffs unsupported allegations and hindsight complaints about EDO's operation of the Zenix business fail to raise triable issues of fact in response to EDO's showing. Thus, the undisputed facts establish that the question of whether Defendant EDO used reasonable efforts is appropriately resolved in Defendant EDO's favor on summary judgment.

**B.      Fraud in the Inducement Claim (Count Four)**

In Count Four, Plaintiffs allege that various representatives of Defendant EDO knowingly misrepresented to Plaintiff Chabria that Defendant EDO had the manufacturing and production capacity to meet the needs of the Zenix customer base and that it would keep the Zenix product line in the marketplace in order to generate revenue. (*See* Am. Compl. ¶ ¶ 65-67 under Count Four[4]). Plaintiffs further allege that Defendant EDO made these false representations for the purpose of inducing Plaintiff Chabria into accepting Defendant EDO's offer to purchase Zenix's assets. (Am. Compl. ¶ 69). Finally, Plaintiffs allege that Plaintiff Chabria, in reliance on these false representations, (1) declined Ghz Technologies' offer to purchase Zenix's assets and instead accepted Defendant EDO's; and (2) complied with the non-competition terms of the Agreement. (Am. Compl. ¶¶ 70-71). Defendant EDO argues here, as they did in their Motion to Dismiss (*See* Mot. to Dis. at 14), that Plaintiffs' fraudulent

---

[4]Plaintiffs misnumbered the paragraphs in their Amended Complaint starting in Count Four where paragraph 63 follows paragraph 68 such that there are two paragraphs for the numbers 63, 64, 65, 66, 67 and 68.

inducement claim should be dismissed because it was not brought within the statute of limitations period. (Def.'s Mot. for Summ. J. at 31-34).  Alternatively, Defendants argue that the fraud in the inducement claim should be dismissed because it is duplicative of Plaintiffs' breach of contract claim and because Plaintiffs have adduced no evidence from which a jury could reasonably find that EDO fraudulently induced Plaintiffs to enter into the APA. (*Id*. at 34-38).

In the Court's February 20, 2007 Order, the Court found that Plaintiffs' claim of fraudulent inducement was timely. (Doc. 25 at 19).  The Court based its conclusion on Plaintiffs' allegations that the misrepresentations were of a continuing nature such that Plaintiffs did not have reason to discover the fraud.  For example, Plaintiffs alleged Defendant EDO continued to make misrepresentations regarding its ability and/or level of commitment to generate gross sales/royalties even after it put the Zenix line into cold storage, and even after it acknowledged to Plaintiff Chabria in May, 2003, that it had ceased work on the Zenix line.  For purposes of ruling on Plaintiffs' Motion to Dismiss, the Court was required to accept as true the well-pleaded facts set forth in the Amended Complaint.  During discovery, however, additional facts have been adduced that bear on the issue.  Upon consideration of these additional facts, the Court concludes that Plaintiffs' claim for fraud in the inducement is untimely and is consequently time-barred.

Under New York law, an action for fraud may be brought within six years from the date the cause of action accrued or two years from the time the plaintiff discovers the fraud.  New York Civil Practice Laws and Rules § 213 provides in relevant part:

The following actions must be commenced within six years:

> . . . 8. an action based upon fraud; the time within which the action must be
> commenced shall be the greater of six years from the date the cause of action
> accrued or two years from the time the plaintiff or the person under whom the
> plaintiff claims discovered the fraud, or could with reasonable diligence have
> discovered it.

McKinney's CPLR § 213 (2004). Thus, an action for fraud in the inducement must be brought

within six years from the date the contract was executed or two years after the fraud was

discovered or could have been discovered had the plaintiff acted diligently, whichever is longer.

*Id.*; *In re Ply *Gem of Laurel, Inc. v. Lee*, 91 A.D.2d 513 (1st Dept. 1982).

In the instant case, the APA was executed on December 9, 1998, and the complaint was

not filed until December 9, 2004. Consequently, Plaintiffs must demonstrate that the fraudulent

inducement claim is timely under the discovery portion of CPLR § 213. A plaintiff seeking to

take advantage of the discovery rule in CPLR § 213 bears the burden of proving that the fraud

was not discovered and *could not have been discovered* until within two years of the

commencement of the lawsuit. *Endervelt v. Slade*, 162 Misc. 2d 975, 981, 618 N.Y.S.2d 529

(N.Y. Supp. 1994). The "statutory period does not await the leisurely discovery of the full

details of the alleged scheme." *Topps Co. v. Cadbury Stani S.A.I.C.*, 380 F. Supp. 2d 250, 258

(S.D.N.Y. 2005) (internal quotation marks omitted). Thus, to commence the running of the

statute of limitations, a plaintiff need not have "positive knowledge of fraud;" rather, "all that is

necessary are sufficient facts to *suggest* to a person of ordinary intelligence the *probability* that

they may have been defrauded." *Watts v. Exxon Corp.*, 188 A.D.2d 74, 76, 594 N.Y.S.2d 44 (3d

Dept. 1993) (emphasis added) (holding that plaintiff's action for fraud was not timely as a matter

of law). Further, the limitations period is triggered when a plaintiff becomes aware of enough

operative facts so that if reasonable diligence were exercised, the plaintiff *could have* discovered

the fraud. *Watts*, 188 A.D.2d at 76. *See also Shannon v. Gordon*, 249 A.D.2d 291, 292, 670

N.Y.S.2d 887 (2d Dept. 1998) (affirming motion for summary judgment on plaintiff's time-barred causes of action for fraud).

In the case at bar, the undisputed facts demonstrate that Plaintiff Chabria had sufficient information before June 6, 2004 to be aware of the alleged fraud. Plaintiffs' claim for fraud in the inducement centers around EDO's alleged representations that it would spend a certain amount of money to operate the Zenix product line, and that it would keep the Zenix product line in operation long enough to generate sufficient sales to pay Plaintiff Chabria $1,200,000 in royalties. Plaintiff Chabria states that almost immediately after entering into the APA, he "began experiencing problems with EDO's willingness to follow through on commitments that it made prior to the APA, and that were necessary for the Zenix product line to succeed at EDO." (Chabria Aff. ¶ 17). Plaintiff Chabria also indicates that he was aware in 2002 that EDO was discussing suspending production of the Zenix product line. (Chabria Aff. ¶ 27). In addition, from June 25, 2002 through March 24, 2003, Plaintiff Chabria received from Eugene Belousof e-mails which related to the future of the microwave line at EDO and which discussed potentially selling the business or putting it into cold storage. On March 10, 2003, Plaintiffs' counsel, Bruno Voltolini, sent a letter to Defendant EDO noting that his client was aware that EDO had exited the microwave ceramics business and requesting payment of unpaid royalties. On May 3, 2003, EDO's attorney, Sean Smith, sent a letter responding to Plaintiffs' request for royalties. The letter plainly stated that EDO was no longer operating the Zenix product line and therefore owed no further royalties to Plaintiff Chabria. Near the end of May, Voltolini called Smith, and Smith reiterated EDO's position that no royalties were owed. Voltolini threatened litigation.

Thus, at the latest, Plaintiffs were on notice of their claim for fraudulent inducement by May 2003—If EDO had promised to keep the Zenix product line in operation such that Plaintiff

Chabria would be paid $1.2 million in royalties, as Plaintiffs allege, EDO's failure to do so was a clear breach. The Court rejects Plaintiffs' attempts to evade the triggering of the statute of limitations by claiming that Plaintiff Chabria was not aware of EDO's alleged fraud because EDO could have eventually resumed production of the microwave line. Upon notification by EDO's counsel that EDO owed no further royalties, Plaintiff had a duty to exercise reasonable diligence to discover his claim.

Accordingly, this Court finds that Plaintiffs' fraud in the inducement claim is time-barred, and Plaintiffs have failed to meet their burden of proving that the alleged fraud was not discovered and could not have been discovered until within two years of the commencement of the lawsuit. Therefore, the Court grants Defendant EDO's motion for summary judgment with respect to Plaintiffs' Count Four Fraud in the Inducement claim.

As an alternative basis for summary judgment on Plaintiffs' fraud in the inducement claim, Defendant EDO argues that the claim should be dismissed because it is duplicative of Plaintiffs' breach of contract claim and because Plaintiffs have adduced no evidence from which a jury could reasonably find that EDO fraudulently induced Plaintiffs to enter into the APA. Having determined that Plaintiffs' claims are barred by the applicable statute of limitations, however, the Court finds it unnecessary to address Defendant's alternative arguments.

## V.  CONCLUSION

For all of the foregoing reasons, the Court **GRANTS** Defendant EDO's Motion for

Summary Judgment (Doc. 47).

The Clerk shall remove Document 47 from the Court's pending motions list.

The Clerk shall remove this case from the Court's pending cases list.

**IT IS SO ORDERED.**


  **/s/ George C. Smith**
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**